### EARNEST v. MOGOLLON CONSOL. MINES CO. et al.

### No. 8543.

Circuit Court of Appeals, Fifth Circuit.

Dec. 20, 1937.

Nathaniel Jacks and John Davis, both of Dallas, Tex., for appellant.

Benj. L. Bird, Alfred McKnight, and Warren Scarborough, all of Fort Worth, Tex., Neth L. Leachman, of Dallas, Tex., and Michael Nagle, Maury Kemp, and Eugene R. Smith, all of El Paso, Tex., for appellees.

Before HUTCHESON and HOLMES, Circuit Judges, and STRUM, District Judge.

HOLMES, Circuit Judge.

This appeal is from a decree denying recovery and dismissing appellant's bill in a proceeding to compel the payment of 5 per cent. of the value of ore concentrates sold by Mogollon Consolidated Mines Company.

On April 23, 1935, Anderson, Barrett, and appellant agreed to advance $25,000 to the Mogollon Consolidated Mines Company, Anderson and appellant agreeing to furnish $5,000 each, and Barrett agreeing to furnish $15,000. At that time, it was thought that this amount would be sufficient to enable the company to make necessary repairs and alterations on its mining properties, and begin the production of ore concentrates which could be sold to refiners. For these advances, the company agreed to pay appellant and Anderson $10,000 each and Barrett $30,000, 25 per cent. of the ore concentrates to be applied to the payment of these sums until paid.

The sums advanced proved inadequate, and Barrett and Troy advanced $15,000 and $10,000, respectively, the mining company agreeing to apply 15 per cent. of the ore until $27,500 had been paid for these advances. Later, Troy acquired Barrett's interest under the first contract, and Barrett advanced $50,000, the mining company agreeing to pay 25 per cent. of its gross receipts from the sale of ore until $60,000 had been paid for this advance. Thus, under the three contracts, in order to obtain $100,000, the company had pledged its revenues to the extent of $147,500, to be paid by the application of 65 per cent. of its gross income receipts.

In mid-July, 1935, it was found that the mine could not begin operations without an additional $20,000. Appellant, Anderson, Troy, and Barrett were requested to advance this amount under a similar contract. In a conference between these parties and Frank Black, of Chicago, not previously connected in any way with the venture, it was found that appellant was unwilling to make further advances, and Anderson was unable to do so. After listening to the discussion for some time, Black advised the parties that the venture could never succeed upon its then financial structure, and that it would not be possible to secure additional funds unless the parties waived their rights to payments from the gross returns and agreed to accept payment from net profits. It was proposed that Black and Troy advance $7,500 each, and Barrett, $5,000, under a new contract, all of the payments to be made from the net profits of the operations.

At the trial, Barrett, Black, and Troy testified that all parties agreed that these payments should be made from net profits. Anderson testified that he agreed to this arrangement, but did not remember whether appellant did so or not. Appellant testified that he did not consent to any waiver or modification of his original contract, but insisted at all times that it be fulfilled in every particular, agreeing to withdraw a notice of his claim to 5 per cent. of the gross which he had previously given to the smelting company on receiving assurance from Barrett, soon to be elected president of the mining company, that, if the notice were withdrawn, the 25 per cent. allocated to the first contract would be withheld from the gross, and that his share would be paid as the funds accumulated.

Barrett was elected president, and appellant wrote a letter to the smelter withdrawing his notice and reciting that it was not his intention thereby to waive any of his rights under his contract with the min-

ing company, and furnished Barrett with a copy thereof. Shortly thereafter, Barrett instructed the manager of the company by letter to notify the smelter to deposit the proceeds of sales of ore in a designated bank, and to notify both the manager and Barrett when the deposits were made. Barrett caused a copy of this letter to be delivered to appellant, with a notation thereon that, as these funds accumulated, 5 per cent. would be paid to him until $10,-000 had been paid in accordance with his contract.

In August, Barrett sent appellant the mining company's check for $172.10, stating that it represented 5 per cent. of the amount received for the first ore shipped. No other payments were made, appellant reinstated his notice to the smelter, and in July, 1936, filed this suit, to recover $10,-000 under his contract, against the company, as defendant, and against the smelter, as garnishee.

The smelter answered, admitting that it had on hand $6,756.98 which it held as stakeholder, the same representing 5 per cent. of the purchase price of ore. The company answered, admitting the indebtedness, but alleging that it was payable out of net profits, and that there had been no net profits. Appellant replied, denying any agreement that the payment might be made from profits and alleging that his only agreement was to withdraw his notice to the smelter in return for the promise of Barrett to take control of the proceeds of the sales, and to apply 5 per cent. thereof to the payment under his contract. When Black and Troy learned of appellant's replication, they filed suit to enjoin appellant from claiming 5 per cent. of the gross, alleging an agreement to accept payment from the net profits. The suits were consolidated; and, on the trial, the court found that appellant had agreed to waive his rights to 5 per cent. of the gross and accept payment from net profits, and rendered its decree accordingly; whereupon this appeal was prosecuted.

It is conceded that this court is not bound by the findings of fact of the court below, but may ascertain the facts anew if it appear that the findings are in error. There is only one issue of fact presented by this record, viz., whether or not appellant orally agreed to waive his right under the contract to payment from the gross receipts from the sale of ore, and to await payment from the net profits.

This issue confronted the trial court, and our examination of the record does not disclose any fact or circumstance which indicates that the court erred in its findings. Holmes v. Cummings, 5 Cir., 71 F.2d 364. While appellant's version of what occurred is consistent with both prior and subsequent transactions and events, and that of appellee is somewhat inconsistent, these discrepancies are of little import when considered along with the situation of the parties and the nature of the business. Moreover, the waiver agreement, as contended for by appellees, while benefiting the mining corporation, was obtained at the insistence of Black as a condition to be met before he would make the advances which would benefit the corporation primarily and each of the individuals secondarily. No inconsistent acts by Black, Troy, or Anderson are shown. The inconsistent acts of Barrett and the corporation are not imputable to these individuals.

Appellant asserts that there could not have been a waiver, for the reason that no ore had been sold, hence no payments could have been due, and there was no existing right to the payment to be waived. This contention is too fallacious to merit comment other than that, unless the validity of the contract be questioned as of the time of its inception, as to rights to waive, assign, merge, modify, and inherit, it was not different from any other executory contract. If appellant did not then have a right which could be waived, he does not now have a right which he can assert.

Appellant makes the odd contention that his negotiations were reduced to writing in the copy of his letter to the smelting company which he furnished to Barrett and in the postscript to the copy of Barrett's letter to his general manager (to the effect that payment would be made from gross earnings), and that these documents represented the only evidence of any agreement he had made. For this contention, he relies upon the rule that the integration of an agreement into a written memorial merges all previous negotiations, and, as said by Professor Wigmore, Evidence, vol. 4, § 2300, results in the establishment of a fact which, in a legal sense, obliterates antecedent facts. However, the correspondence does not purport to be an integration of prior negotiations which could be merged therein, does not specify parties, terms, or subject matter of any previous agreement, and is not chargeable to two of

the parties to the agreement contended for by appellees. At most, it is evidence of subsequent inconsistent conduct by one of the parties to the alleged waiver agreement, which might be taken into consideration in weighing the testimony of that party and any others who had notice thereof and acquiesced therein. Adams v. Adams, 160 Ind. 61, 66 N.E. 153; Walsh v. Lunney, 75 Neb. 337, 106 N.W. 447. Our conclusion is, since the parties did not intend that the two letters should constitute a memorial of the agreement, that appellant waived his original right to payment from gross receipts, and became bound by the parole agreement to accept payments from the net profits of the mining operations.

The decree of the District Court is affirmed.